UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                        Case No. 8:26-cr-101-KKM-SPF

ANN MARY ZHENG

_____/

**ORDER OF DETENTION**

The Defendant stands indicted on one count of being an accessory after the fact and one count of evidence tampering.  (Doc. 1).  Both of these crimes relate to an alleged attempt by the Defendant's brother, Alen Zheng, to detonate an improvised explosive device (IED) outside the Visitor Center at MacDill Air Force Base (MacDill) on March 10, 2026.[1]  *Id*.  While the Defendant's brother and the Defendant are U.S. citizens, the Defendant's brother has already fled to China. Further, the Defendant's parents are Chinese nationals and are currently in the process of being deported to that country.

At the Defendant's initial appearance on the above charges, the government made an oral motion to detain the Defendant, arguing that there was a serious risk she would flee and/or obstruct justice and that there were no condition or combination of conditions that would reasonably assure her appearance as required.

---

[1] The Defendant's brother has been separately charged for this alleged offense.  *See United States v.*

*See* (Doc. 8); 18 U.S.C. §§ 3142(e), (f)(2)(A), (f)(2)(B).[2]  The Defendant opposed the government's motion, asserting that she should be released with a few limited conditions, including reporting to Pretrial Services as directed, surrendering her passport, remaining in this District, and seeking and maintaining employment.

Given the contested nature of the government's detention motion, the Court commenced a hearing on the matter, at which the parties proffered information and evidence in support of their respective positions.  In the midst of that hearing, however, defense counsel asked that the Court continue the proceeding so that she could further confer with her client.  The Court granted that request over the government's objection and resumed the hearing several days later.  In the interim, the Defendant filed a *Motion to Set Reasonable Conditions of Pretrial Release* (Doc. 19), to which government filed a response in opposition after the conclusion of the resumed hearing (Doc. 24).

The Court has now had an opportunity to review the parties' submissions, as well as listen again to the entirety of the recording from the two-day detention

---

*Alen Zheng*, Case No. 8:26-cr-102-CEH-LSG.

[2] Notwithstanding the fact that the crimes with which the Defendant has been charged concern an attempted bombing, the government notably does not move to detain the Defendant pursuant to section 3142(f)(1)(A), which authorizes the government to seek detention "in a case that involves . . . a crime of violence[.]"  As the government points out in a recent filing (Doc. 24 at 1 n.1), whether section 3142(f)(1)(A) applies under the circumstances presented here is the subject of a circuit split, *compare United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992) (observing that, under section 3142(f)(1)(A), "it is not necessary that the *charged offense* be a crime of violence[,] only that the *case involve* a crime of violence") *with United States v. Watkins*, 940 F.3d 152, 164 (2d Cir. 2019) (rejecting the "interpretation of the word 'involves' in section 3142(f)(1) as permitting consideration of related, but uncharged, conduct").  Because the government does not rely on section 3142(f)(1)(A) as part of

hearing.  Having carefully considered all the information before it, the Court hereby grants the government's detention motion (Doc. 8) on the ground that—at a minimum—the Defendant is a flight risk and denies the Defendant's motion for release (Doc. 19).  As mandated by 18 U.S.C. § 3142(i), the Court offers the following findings of facts and reasons for its detention determination.

To prevail on its request for detention, the government must show by a preponderance of the evidence that—as pertinent here—the Defendant poses a serious risk of flight.[3]  *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990) (citing *United States v. King*, 849 F.2d 485, 489 (11th Cir. 1988)).  In assessing whether the government has met its burden, the Court looks to the factors enumerated in 18 U.S.C. § 3142(g).  *United States v. Houston*, 2009 WL 10674021, at *2 (M.D. Fla. Aug. 20, 2009).  When weighing these factors, there is case authority that the Court may take into account the danger posed by the Defendant's release even though the government's detention motion is predicated solely on risk of flight. *See*, *e.g.*, *United States v. Castellanos-Almendares*, 2019 WL 3937862, at *3 (S.D. Fla. Aug. 20, 2019) ("[E]ven if the [g]overnment . . . only has statutory grounds to request a detention hearing on the basis that the defendant is a serious risk of flight or nonappearance, the [g]overnment can still move for detention and present evidence on the additional ground that the defendant is a danger to another person or to the

---

its detention motion, the Court will not endeavor to resolve the issue.

[3] The same standard applies for detention motions based on a serious risk of obstruction of justice. *See United States v. Valcourt*, 2025 WL 1220044, at *3 (S.D. Fla. Apr. 28, 2025).

community[.]"); *United States v. Holmes*, 438 F. Supp. 2d 1340, 1351 (S.D. Fla. 2015) (concluding that "dangerousness as a grounds for detention is not excluded in cases involving detention hearings" premised on a risk of flight).

The first of the section 3142 factors is the nature and circumstances of the charged crimes. 18 U.S.C. § 3142(g)(1). Here, as detailed at both the detention hearing[4] and in the parties' submissions, the Defendant allegedly aided her brother in evading prosecution after he confessed to her that he had planted an IED at MacDill and discarded a "burner phone" he used during the commission of this offense. (Doc. 24 at 5–6). According to the government, the Defendant's assistance included purchasing airplane tickets for herself and her brother to travel to China, which—as the government emphasizes—does not have an extradition treaty with the United States. *Id*. at 3–4. It also included the Defendant researching ways to secure her brother's admission to China and to ensure his long-term success there;[5] traveling with her brother to China and remaining there for several days to facilitate his transition to living in that country; disposing of the vehicle—a black Mercedes Benz GLK 350 registered to the Defendant—that her brother allegedly utilized to transport the IED to MacDill; and investigating ways to transfer property in the Defendant's name to other family members. *Id*. at 3–11. To underscore the severity of the

---

[4] As there is no formal transcript of the detention hearing, the Court is not able to include citations to those parts of the hearing on which it relies in rendering its findings.

[5] This research was performed by the Defendant on her cell phone (which she has agreed to let the government examine) and included the Defendant asking ChatGPT, "can I buy plane tickets in cash at the airport," "how to get a full [C]hina visa in [H]ong [K]ong," "this is for my brother," and "how

Defendant's alleged conduct, she is facing a maximum imprisonment term of ten years on the accessory after the fact count and a maximum imprisonment term of twenty years on the evidence tampering count. *See id.* at 6; 18 U.S.C. §§ 3, 844(f)(1), 1512(c)(1). The Defendant's multiple surreptitious efforts to facilitate her brother's escape to China and to enable him to avoid prosecution for a dangerous and potentially lethal crime favors detention.

The second factor—the weight of the evidence against the Defendant—likewise militates against her release. 18 U.S.C. § 3142(g)(2). That evidence consists of, among other items, surveillance video of the Defendant's brother driving the Defendant's Mercedes to MacDill on March 10, 2026;[6] subpoenaed records showing that the next day, the Defendant bought airplane tickets to China for herself and her brother; the Defendant's ChatGPT search on her cell phone the same day inquiring whether there was "a way to track" her Mercedes; a bill of sale and surveillance video reflecting that the Defendant sold the Mercedes to CarMax on March 12, 2026; a subsequent search of the Mercedes that led to the discovery of certain IED components, receipts for the brother's "burner phone," residue in the trunk believed to be derived from the IED, and "striations" in the trunk as well indicating that it had been vacuumed prior to the vehicle's sale;[7] surveillance video of the Defendant

---

long can [a U.S.] citizen stay in [C]hina." (Doc. 24 at 3–4 & n.2).

[6] There is also surveillance video of the Defendant's brother driving the Defendant's Mercedes to a Best Buy Store from which he purchased the burner phone. (Doc. 24 at 4).

[7] According to the government, CarMax advised that it did not vacuum the Mercedes or otherwise attempt to clean the vehicle's interior.

at the airport as she and her brother prepared to leave for China; and the Defendant's confession upon returning to the United States that she was "fully aware" of her brother's attempted bombing when she disposed of the Merecedes and helped her brother flee to China. (Doc. 24 at 3–6). The strength of this evidence, coupled with the potentially lengthy prison time the Defendant is facing if convicted, provide her with a strong incentive to flee. *See United States v. Govoni*, 2025 WL 1997709, at \*8 (M.D. Fla. July 18, 2025) ("A defendant facing a substantial term of imprisonment has commensurate incentive to flee insofar as the cost of taking h[er] chances at trial is great in comparison to the cost of fleeing.") (internal quotation marks and citation omitted); *United States v. Al-Arian*, 280 F. Supp. 2d 1345, 1358 (M.D. Fla. 2003) ("The stronger the government's case, especially if the sentence will be severe, the greater a defendant's incentive to flee."); *see also United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) (observing that a "defendant facing a potentially lengthy prison sentence possesses a strong motive to flee") (citing *United States v. Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007)); *United States v. Allen*, 891 F. Supp. 594, 598 (S.D. Fla. 1995) (noting that the probability of facing a lengthy sentence upon conviction creates a "strong incentive" for a defendant to flee). This is especially true since, as referenced above, the Defendant can escape to a safe haven—i.e., China—which does not have an extradition treaty with the United States and which is where several of her family members reside. *See United States v. Namer*, 2000 WL 1872012 (6th Cir. 2000) (observing that "the potential for [the defendant's] flight to and his family ties

in a country with which extradition is not attainable" supports detention); *United States v. Xiaorong You*, 2019 WL 2426659, at \*4 (E.D. Tenn. June 10, 2019) (finding "that the second [section] 3142(g) factor strongly favor[ed] the government because conviction [of the defendant wa]s likely, . . . [which] provide[d the defendant] with a motive and incentive to flee to a country without extradition to the United States"); *cf. United States v. Yeh*, 2013 WL 6568118, at \*4 (N.D. Tex. Dec. 13, 2013) (stating that "the likelihood of flight for any defendant who is facing any possibility of a prison sentence would substantially increase" if she were permitted to travel to a foreign country where members of her family lived and which did not have an extradition treaty with the United States).

The third factor—the Defendant's history and characteristics—also counsels in favor of detention. 18 U.S.C. § 3142(g)(3). While it appears from the Pretrial Services Report that the Defendant has no criminal history, resides in this District, and is employed at least part time here, there are other aspects about her that demonstrate she poses a significant flight risk.

To begin, the Defendant has strong ties to China. Not only does her brother now live in China,[8] the Defendant told law enforcement her grandparents do as well. (Doc. 24 at 7). Moreover, as noted above, the Defendant's father and mother are

---

[8] The government's response to the Defendant's motion for release details communications between the Defendant and her mother, which posit that the Defendant's brother may be able to remain in China for as long as he wishes. (Doc. 24 at 8) (asserting that the travel document used by the Defendant's brother will allow him to "stay in China for any length of time—two years, three years, whatever"). If this is true, it is fair to infer that the Defendant could stay in China indefinitely if she

Chinese nationals who never acquired legal status in the United States and are presently in the custody of Immigration and Customs Enforcement with final orders of removal pending. *Id.* at 6.

As for the Defendant herself, she spent several years in China as a child and—according to the government—possesses a "Chinese travel document that would permit her entry into China." *Id.* at 8. In addition, the Pretrial Services Report reveals that the Defendant has lived as an adult in England and multiple states other than Florida, and that despite her relatively young age of twenty-seven, the Defendant has traveled extensively overseas, including to countries like Portugal, France, Spain, and Italy.

The evidence proffered by the government further suggests that the Defendant is willing to engage in deception when necessary to protect her own interests or those of her family. According to the government, when the Defendant returned to the United States from China after escorting her brother there, she was questioned by Customs and Border Protection (CBP) about her "last-minute decision" to buy plane tickets to China. *Id.* at 4. The Defendant responded by lying that she took her brother to China "to stay with their grandparents because he had disagreements with their parents and needed dental work." *Id.* (internal quotation marks omitted).

The Defendant was also not completely forthcoming at the detention hearing regarding three rental properties which are deeded in her name and which furnish

fled.

her and her parents with passive income.  Seemingly in an effort to bolster her claim that these real estate holdings show that she has substantial ties to this District, she represented on the first day of the hearing—falsely as it turns out—that she "put  . . . money into buying the properties."  Despite being afforded several days to discuss this issue with her lawyer and to clarify her position, the Defendant again indicated at the resumed hearing that she helped to pay for these properties, representing at one point that while she was "not sure" how much funding she contributed to the properties' acquisition, the properties "were purchased hand-in-hand with [her] involvement."  It was only after further probing by the Court that the Defendant eventually acknowledged that her parents bought the properties by themselves.[9]

It likewise appears that the Defendant was not fully candid with Pretrial Services following her arrest.  During her interview with Pretrial Services, the Defendant identified her sources of income as consisting of her "part time" position as a "cashier" at her "parent's restaurant" and the passive income she obtained from the three rental properties.  Yet, according to the government, the Defendant reported to CBP and the FBI during a separate interview that she worked as a day trader.  (Doc. 24 at 11).  The Pretrial Services report contains no mention of this third revenue stream.

---

[9] The Defendant's continued prevarication on the question of who bought the rental properties is especially baffling because, by the second day of the hearing, her attorney had already stated in her motion seeking the Defendant's release that this real estate had been purchased solely by the parents. (Doc. 19 at 5).  The Court's colloquy with the Defendant on this issue regrettably seemed more like "trying to pin Jello to the wall" than a straightforward dialogue about what should have been a

Along with the Defendant's seeming displays of mendacity, the Defendant has also proven herself adept at laying a foundation for fleeing from prosecution if need be. Relative to her brother, for example, the government proffered that the day after the alleged attempted bombing, the Defendant made a number of queries to ChatGPT pertaining to family properties in her brother's name.[10] Such queries included whether her brother "need[ed] to sign [a] power of attorney [regarding the real estate in his name] or transfer them first;" "[h]ow to do [a] power of attorney the fastest;" "[w]ould it be better for h[er brother] to transfer all the property to [the Defendant's] name;" "[w]hat if he[r brother] transfer[ed the property] . . . to [an] LLC;" and "[w]hat if the LLC [wa]s under [the Defendant's] name." (Doc. 24 at 10–11). Notably, these courses of action that the Defendant explored on behalf of her brother so that he could avoid capture are similar to, if not the same as, the steps she could take if she sought to flee to China.

Beyond these history and characteristics of the Defendant, she and her family appear to have ample financial resources to support the Defendant's flight from prosecution. According to the Pretrial Services Report, the Defendant and her parents own three properties in which they collectively have roughly $400,000 in equity. There is nothing in the record indicating that the Defendant or her parents could not borrow against these real estate holdings or simply sell them if they so

---

simple matter.

[10] According to the government, the Defendant's brother is the lone owner of one property and the co-owner of the family residence. (Doc. 24 at 10).

desired.  Indeed, as the government points out, by transferring title or granting a family member power of attorney, the Defendant could have these assets liquidated and the funds transferred to her without necessarily being in the United States.  (Doc. 24 at 11).  This is particularly so since the Defendant does not propose using these rental properties as collateral to secure a bond.  And even if the Defendant and her parents did post these properties, they would still serve as a steady stream of income for the family regardless of where they lived.[11]  Moreover, because the Defendant— as she now admits—did not put up any of her own money to acquire the rental properties deeded to her by her parents, they do not meaningfully tie her to the community in any event.  It also bears highlighting in this regard that the properties in which the Defendant's brother has an ownership interest did not prevent him from fleeing to China.

In an effort to counter all this proof, the Defendant maintained at the detention hearing that her role of securing rents and paying the mortgage for the three rental properties demonstrate that she is not a flight risk.  This argument is

---

[11] In its response and at the hearing, the government intimated that the Defendant's parents have more money than what might be evident at first blush.  (Doc. 24 at 10–11).  The government noted in this respect that according to Florida Department of Revenue employee wage information, the most the Defendant's parents earned in any quarter since the second quarter of 2021 was $19,500.  *Id*. at 11.  Yet, as also detailed in the government's response, the Defendant's parents expended more than $300,000 in cash in acquiring the above three rental properties starting in 2019.  *Id*. at 10.  The government additionally proffered at the hearing that it found documentation at the home where the Defendant and her parents were residing indicating that the parents had an account with the Bank of China.  The government further represents in its response that it has information the Defendant's brother is "staying at a home [in China] owned by the 'Zheng Fuming' family Fujian Province."  (Doc. 24 at 7).

wholly unpersuasive.   As the government contends, it is fair to assume in this modern age that landlords and other property owners can electronically manage their financial responsibilities associated with their real estate holdings from anywhere in the world, including from China.  (Doc. 24 at 10).  Even were that not the case, there are other members in the Defendant's family who could seemingly take on these rather straightforward responsibilities.   One is the Defendant's uncle, who—according to the Defendant—owns and operates the restaurant where she has been working.  *See* (Doc. 19 at 6).  Another is the Defendant's other brother, Abery Zheng, who resides in Spring Hill, Florida and who—according to the Defendant—has his own properties.   The Defendant's contention at the detention hearing that Abery Zheng's current circumstance—which she claims includes working and attending school to become a radiology technician—would preclude him entirely from receiving monthly rents and making monthly mortgage payments for the Defendant's properties is not credible, much less sufficiently supported.   This is especially the case to the extent that Abery Zheng is a landlord himself and is thus presumably experienced with such matters.

The fourth and last factor—the nature and seriousness of the danger to the community posed by the Defendant's release—does not favor detention.  18 U.S.C. § 3142(g)(4).  As the government concedes, there is no evidence at this juncture that the Defendant participated in the attempted bombing or even knew about it in advance.

Taking into account all the above considerations, the Court finds that the government has met its burden of showing by a preponderance of the evidence that there is at least a serious risk the Defendant will not appear as directed.  As explained previously, the Defendant has strong ties to China, which has no extradition treaty with the United States; has a strong incentive to flee to that foreign nation or elsewhere due to the strength of the evidence against her and the fact that most of her family—including her parents, grandparents, and one of her brothers—no longer reside in the United States and are either currently living in China or will soon be living there; and has both the financial wherewithal and the resourcefulness to flee, as evidenced by the assistance she provided her brother only a month ago in facilitating his hasty departure to China.[12]

The release conditions proposed by the Defendant, which includes surrendering her passport, do not overcome these concerns in light of the specific circumstances presented.  *See United States v. Bonilla*, 388 F. App'x 78, 80 (2d Cir. 2010) (upholding the district court's finding that although the defendant surrendered his passport and had close family in the state where the court was situated, he still posed a flight risk because he had significant ties to the Dominican Republic); *United States v. Haider*, 2023 WL 8544277, at *2 (E.D. Cal. Dec. 11, 2023) ("Despite [the d]efendant's willingness to surrender his passports, the [c]ourt shares the

---

[12] As a result of this finding, the Court need not address whether there is also a serious risk the Defendant will obstruct justice.  The Court notes only that if past is prologue, there is good reason to believe that the Defendant would tamper or destroy evidence if it would help her evade prosecution

[g]overnment's concerns about [the d]efendant's flight risk based on[, among other factors, his] . . . international family ties."); *see also United States v. Wasendorf*, 2012 WL 4793366, at *3 (N.D. Iowa Oct. 9, 2012) ("Although 'fleeing' is typically associated with fleeing ab[ro]ad, fugitives flee with the United States' [borders] successfully as well. Moreover, it is possible—although difficult—to flee abroad without a passport."). Nor would more stringent conditions, such as home detention with electronic monitoring, be adequate. *See United States v. Townsend*, 897 F.2d 989, 994–95 (9th Cir. 1990) (observing that the wearing of an electronic device does not "offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction"); *United States v. Maxwell*, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020) ("[H]ome detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start.") (internal quotation marks and citation omitted); *United States v. Anderson*, 384 F. Supp. 2d 32, 41 (D.D.C. 2005) ("Conventional electronic monitoring . . . would only apprise authorities of whether [the defendant] was in or out of his home, and would . . . give him ample lead time if he wished to flee.") (citing *Townsend*, 897 F.2d at 994–95).

Based upon the foregoing, the Defendant is hereby committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The Defendant shall be

for the instant crimes.

afforded a reasonable opportunity to consult with defense counsel.  On order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility shall deliver the Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

SO ORDERED in Tampa, Florida, this 16th day of April 2026.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record

15