UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                            CASE NO. 8:26-cr-101-KKM-SPF

ANN MARY ZHENG

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE DETENTION ORDER

The United States opposes the Defendant's Motion to Revoke the Detention Order. (Doc. 37). The Magistrate Judge correctly determined that the defendant is a flight risk and that no conditions of release will reasonably assure her appearance at future proceedings.

## BACKGROUND

On March 10, 2026, Alen Zheng planted an improvised explosive device ("IED") outside the Visitor's Center at MacDill Airforce Base. Ann Mary Zheng, the defendant, is Alen Zheng's older sister. In the wake of Alen Zheng's crime, the defendant destroyed evidence for him and helped him flee prosecution to the People's Republic of China. The defendant now faces a two-count indictment for her actions.

On March 25, 2026, a grand jury returned an indictment charging the defendant with accessory after the fact in violation of 18 U.S.C. § 3 and evidence tampering in violation of 18 U.S.C. § 1512(c)(1). Federal Bureau of Investigation ("FBI") agents arrested her that day. She appeared before the Magistrate Judge on

March 26, 2026, for her initial appearance and arraignment. Doc. 9. The United States moved for the defendant's pretrial detention pursuant to 18 U.S.C. §§ 3142(f)(2)(A) and (B) and argued that the defendant posed a serious risk of flight and obstruction of justice and that no condition or combination of conditions will reasonably assure her appearance. The defendant elected to proceed with the detention hearing on March 26, before later requesting it be continued for her to obtain accurate information on her properties and financial situation. The Magistrate Judge continued the hearing to March 31, 2026.

On March 30, 2026, the defendant filed, under seal, a motion to set reasonable conditions of pretrial release. Doc. 17. The next day, at the continued detention hearing, the Magistrate Judge gave the United States the opportunity to respond to the defendant's motion in writing by April 3, 2026.  The United States timely responded. Doc. 24. On April 16, 2026, the Magistrate Judge ordered the defendant detained pretrial, finding that "that the government has met its burden of showing by a preponderance of the evidence that there is at least a serious risk the Defendant will not appear as directed." Doc. 35 at 13.

## ARGUMENT

The Magistrate Judge correctly held that the Government has shown that the defendant is a substantial flight risk by a preponderance of the evidence. *See United States v. Quartermaine*, 913 F.2d 910, 915-17 (11th Cir. 1990). The Bail Reform Act lays out four factors to consider when determining whether a defendant is a flight risk and whether there are conditions of release that will reasonably assure the

appearance of the person. These factors are the nature and severity of the charges, the weight of the Government's evidence against the defendant, the background and characteristics of the defendant, and the nature and seriousness of the danger posed by the defendant's release. 18 U.S.C. § 3142(g). Here, these factors establish that the defendant is a flight risk and that no conditions will reasonably ensure that she appears.

## A. The nature and circumstances of the offense charged

The defendant's brother committed serious, dangerous, and violent crimes. He built an IED, planted it at a building at MacDill (that is meant to welcome visitors including civilians) on the evening of March 10, 2026, and lit the fuse. The defendant covered up her brother's crimes and helped him in his effort to get away with them.

Records obtained pursuant to a subpoena to Expedia show that on March 11, 2026, "Annmary Zheng" bought airplane tickets for herself and Alen Zheng to China. Exhibit A. The defendant accompanied Alen Zheng to China, presumably to guarantee he arrived without encountering law enforcement intervention. Evidence from the defendant's cellphone[1] revealed she researched ways to secure Alen Zheng's admission to China and ensure his success there. On March 11, 2026, she asked ChatGPT, "how to get a full [C]hina visa in [H]ong [K]ong," "this is for my brother," "can he transfer to a college or university in [C]hina," "what are some

---

[1] The defendant consented to a search of her cellphone.

good colleges in [C]hina Fuzhou," and "how long can [a U.S.] citizen stay in [C]hina?" Exhibit B. While China is the defendant's parents' home country, it is also—significantly—a country from which the United States cannot extradite.

On March 17, 2026, the defendant returned to the United States from China. She first entered the United States in Detroit. There, Customs and Border Protection ("CBP") conducted a secondary inspection. Exhibit C. The defendant argues that if she intended to flee, she would have done so from Detroit and that her return to Tampa is evidence against her risk of flight.

But CBP did not ask the defendant about the IED, MacDill, or her involvement. CBP inquired about her last-minute decision to buy plane tickets to China. *Id.* The defendant claimed she took Alen Zheng to China "to stay with their grandparents" because he had disagreements with their parents and needed "dental work." *Id.* CBP gave no indication that the defendant was under investigation. *Id.*

The defendant also tampered with a key piece of evidence. Alen Zheng drove the defendant's black Merecede GLK 350 to buy at least some components he used to build the IED and transport the completed IED to the Visitor's Center. Surveillance video shows Alen Zheng drove that vehicle to a Best Buy store from which he purchased a burner phone used in commission of the crime. The FBI ultimately found the burner phone receipt and a receipt for two two-liter Cherry Pepsi bottles inside the vehicle; Alen Zheng used the bottles to house his IED. Perhaps most importantly, surveillance video shows that on March 10, 2026, Alen Zheng drove the IED to MacDill in the trunk of the vehicle.

On March 11, 2026, presumably concerned about law enforcement searching the vehicle's infotainment system, the defendant asked ChatGPT, "is there a way to track a 2010 [M]ercedes glk350?" Exhibit B. The next day, the defendant sold the vehicle to CarMax for $5,000, as reflected in the bill of sale and CarMax surveillance video. Exhibit D; Exhibit E. FBI agents located the vehicle and seized it pursuant to a warrant on March 19, 2026. They observed the carpet in the trunk of the vehicle had striations consistent with it having been recently vacuumed. Exhibit F. Notwithstanding that, agents still found residue in the carpet that the FBI lab determined matched the material inside the IED. CarMax confirmed to the FBI that it had not cleaned the interior of the vehicle since purchasing it on March 12, 2026.

By planning and executing Alen Zheng's escape, the defendant frustrated this Court's ability to exercise its power in the case against Alen Zheng. As the Magistrate Judge opined, "The Defendant's multiple surreptitious efforts to facilitate her brother's escape to China and to enable him to avoid prosecution for a dangerous and potentially lethal crime favors detention." Doc. 35 at 5. The defendant also hindered law enforcement's ability to investigate the crime. Had Alen Zheng remained in the country, agents could have questioned him in an effort to learn valuable information, including whether he had built other devices and the identities of conspirators, if any.

## B. The weight of the evidence against the defendant

As described in detail above, the evidence against the defendant consists of video surveillance, documents, and the contents of her cellphone. Additionally,

5

during a consensual interview with FBI agents at the Tampa International Airport on March 18, 2026, the defendant said Alen Zheng had admitted to her on March 11, 2026, that he had planted the bomb at MacDill. By her own admission, the defendant was fully aware of her brother's crime before she helped him flee and sold the black Mercedes GLK 350.

The defendant faces a maximum penalty of 30 years in prison. Given the prospect of significant federal prison time, the strength of the evidence provides incentive for the defendant to flee. *See United States v. Govoni*, 2025 WL 1997709, at *8 (M.D. Fla. July 18, 2025) ("A defendant facing a substantial term of imprisonment has commensurate incentive to flee insofar as the cost of taking h[er] chances at trial is great in comparison to the cost of fleeing.") (internal quotation marks and citation omitted); *United States v. Al-Arian*, 280 F. Supp. 2d 1345, 1358 (M.D. Fla. 2003) ("The stronger the government's case, especially if the sentence will be severe, the greater a defendant's incentive to flee."); *see also United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) (observing that a "defendant facing a potentially lengthy prison sentence possesses a strong motive to flee") (citing *United States v. Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007)). That is especially concerning in this case because defendant can escape to a country with no extradition treaty with the United States. *See United States v. Namer*, 2000 WL 1872012 (6th Cir. 2000) (observing that "the potential for [the defendant's] flight to and his family ties in a country with which extradition is not attainable" supports detention); *United States v. Xiaorong You*, 2019 WL 2426659, at *4 (E.D. Tenn. June 10, 2019) (finding "that the

6

second [section] 3142(g) factor strongly favor[ed] the government because conviction [of the defendant wa]s likely, . . . [which] provide[d the defendant] with a motive and incentive to flee to a country without extradition to the United States"); *cf. United States v. Yeh*, 2013 WL 6568118, at *4 (N.D. Tex. Dec. 13, 2013) (stating that "the likelihood of flight for any defendant who is facing any possibility of a prison sentence would substantially increase" if she were permitted to travel to a foreign country where members of her family lived and which did not have an extradition treaty with the United States).

## C. The history and characteristics of the defendant

Relevant to the assessment of the defendant's history and characteristics are "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). The defendant is well educated. She reported to Pretrial Services that she is in good physical and mental health and does not use drugs or alcohol. She has no criminal history.

The defendant's family ties, community ties, and financial resources all weigh in favor of detention. The defendant's mother and father are Chinese citizens and nationals who never acquired legal status in the United States. On March 18, 2026, Immigration and Customs Enforcement's Enforcement and Removal Operations ("ICE ERO") took them into custody. They both have final orders of removal

pending. According to Department of Homeland Security Forms I-213 for the defendant's parents, they will "remain in custody pending removal." Exhibit G. The United States therefore expects that they will be removed from the country and deported to China. Alen Zheng in presently in China. The defendant told CBP that her grandparents are in China.

In the defendant's phone, agents found photographs of a form entitled "Accommodation Registration Form for Persons From Abroad" for Alen Zheng. Exhibit H.[2]  In the form, Alen Zheng identified as a Chinese national and noted that he would be staying at a home owned by the "Zheng Fuming" family Fujian Province. *Id.* According to the form, he would be permitted to remain in China until March 25, 2028. *Id.* Also in the defendant's phone was a photograph of the following Chinese travel document (Exhibit I):



---

[2] This document was translated into English by FBI linguists.

The FBI and CBP reviewed Passenger Name Records ("PNR") for the defendant and Alen Zheng related to their trip to China. A PNR is a digital record in an airline's computer reservation system that contains the itinerary for a passenger or a group of passengers traveling together. Alen Zheng's PNR contained two numbers of interest—his U.S. passport number and the red number listed on the top-right corner of the Chinese travel document depicted above. Exhibit J.[3] The defendant's PNR also contained her U.S. passport number and a number (ending in 6862) believed to be a Chinese travel document number. *Id.* The defendant's PNR indicates the document bearing the number ending in 6862 will expire on April 3, 2027. *Id.* The United States thus believes the defendant has a Chinese travel document that would permit her entry into China.

In the defendant's mother's phone[4], agents found voice messages about Alen Zheng's documents. On March 15, 2026, the defendant's mother sent her multiple voice notes[5] over WeChat:

> Because this Travel Document is, it is, uh, it is meant to represent the passport. So, you, you, when the time comes, for example, it doesn't say, uh, half a year, uh, this, uh, [clears throat] half, uh, half a year. . . Because Beibei [PH], he/she … he/she is an adult, he/she can actually stay in China however long, for example, for two years, three years, it's ok. There's no such concept of half a year. It is, uh, after this, uh, for example, when the time comes, after one year, after two years, after three years, he/she wants to come, return to America again because he/she is an American, a U.S. citizen, so when he/she returns to America again, when he/she leaves the border, the PRC, like, like the

---

[3] See entries 150, 154, 159, and 162 in Exhibit J.
[4] The defendant's mother consented to a search of her cellphone.
[5] The voice notes were translated by FBI linguists.

Customs will require him/her, like, to show document saying this, this, this, exit, Exit Document. That is called Exit Document, not Exit Card.

Like, when the time comes to go to the, the police station to show this. . . So, you need to safeguard this Travel Document of Beibei's [PH]. Because this Travel Document is the representation of his/her status. It is to represent. . . Because his/her passport, like, must accompany his/her Travel Document to be valid. So, the Travel Document should be safeguarded. When the time comes, no matter after one year, two years, or three years, if he/she wants to return to America again, like [they'll] go to the police station to apply for the Exit Document, then he/she would be able to, uh, he/she would be able to come to America again.

The Travel Document and that, the Exit Document mom was just talking about are actually the same thing, which is to accompany the passport. It is, because Beibei [PH], Beibei's Travel Document though. . . is for two years, only for two years, isn't it? If he/she stays in China for over three years, his/her Travel Document is still going to be invalid. He/she'll still need to get the Exit Document. So, it's like the Travel Document is referred to as "Travel Document" when leaving America, but when like you are already in a local place and want to come into America, it's referred to as the "Exit Document".

So, as you are handling all of these things, have Beibei [PH] do it himself/herself first, and you stay on his/her side … like … uh … take a look for him/her and see where he/she needs help, and stuff like that. Let him/her do that … do it. Also, have Beibei listen to these messages mom sent you. This way he/she will know the entire process. Our … this … this … [speaking in dialect. . .] [Tsk-tsk] Where lies the problem? It is that … like … he/she doesn't usually do anything, doesn't know the ins and outs of a matter … like doesn't have … doesn't have a . . . He/she feels like he/she is useless. Like, we should let him/her form … uh … form that kind of idea.

About all these, we can consult with a few more travel agencies in the future. These should be fine for now. Uh … As for the school, also take

10

your time. It's also … also not urgent for now. Like wait until Beibei [PH] has made his/her decisions, *following* what he/she wants to do, then go from there gradually. When that time comes, if Beibei wants to go to college, because Grandma has … has … has … has a few … that … grand … granddaughters, who are educated, so they will offer help as well. Don't worry about these, ok? It's like, basically for now, like there's nothing that needs to be done urgently for us.

According to the U.S. State Department's website,

China does not recognize dual nationality. Entering on a Chinese-issued travel document (台胞证 taibaozheng or 旅行证 luxingzheng) or possession of valid Chinese identity documents (身份证 shenfenzheng or 户口本 hukouben) impedes the U.S. government's ability to provide consular services in case of exit ban, detention, or disappearance.

. . .

If you . . . enter China on a Chinese-issued travel document (台胞证 taibaozheng or 旅行证 luxingzheng), Chinese authorities may consider you to be Chinese only and not recognize your U.S. citizenship. They may restrict or prohibit U.S. consular assistance if you are subject to an exit ban, emergency, disappearance, arrest, or detention.

*See* U.S. Department of State, China, Tips from the U.S. embassy, https://travel.state.gov/en/international-travel/travel-advisories/china.html (last accessed April 20, 2026).

The defendant asserts that her community ties will prevent her flight. Her parents bought her three properties within the Middle District of Florida which are deeded in her name. Publicly available property records show the first property was purchased in May 2019 for approximately $83,000. Exhibit K. Two years later, the defendant took out a 15-year mortgage on the property in the amount of $123,600.

11

*Id.* The second property was purchased in January 2021 for $115,000. Exhibit L. That property is unencumbered. The third property was purchased in June 2021 with a mortgage. The purchase price was approximately $365,000 and the 30-year mortgage was in the amount of $237,250, meaning the Zhengs paid approximately $128,000 in cash at closing. Exhibit M. These properties are rented to tenants.

County records show that Alen Zheng was the sole owner of one property and a co-owner of the Zheng's family residence, which did not thwart his flight. Exhibits N and O. The defendant's phone contained the following queries she made to ChatGPT on March 11, 2026: "he has houses under his name, does he need to sign power of attorney or transfer them first;" "How to do power of attorney the fastest;" "Would it be better for him to transfer all the property to my name;" "What if he transfer[ed] it to LLC;" "What if the LLC is under my name." Exhibit B. The defendant sought ways for her brother's assets to remain safe in their family and she can do the same with her own properties. Indeed, by transferring title or granting a family member power of attorney, the defendant could have the assets liquidated and the funds transferred to her without being in the Midde District of Florida.  As the Magistrate Judge noted, "these courses of action that the Defendant explored on behalf of her brother so that he could avoid capture are similar to, if not the same as, the steps she could take if she sought to flee to China." Doc. 35 at 10.

Employee wage information maintained by the Florida Department of Revenue shows that since the second quarter of 2021, the most the defendant's father reported earning in a quarter was $15,000 and the most her mother reported was

12

$4,500. Exhibit P. Given their earnings and the amount of money they spent on the properties, it is possible the defendant's family has financial resources of which the United States is unaware. Additionally, the defendant reported to Pretrial Services that she works part-time as a cashier at her family's Chinese restaurant and earns rental income from the three properties. The defendant reported to both CBP and the FBI that she works as a day trader, which she did not disclose to Pretrial Services.

The Magistrate Judge considered the defendant's lack of candor on that and other issues as "seeming displays of mendacity." Doc. 35 at 10. The United States agrees. As noted, the defendant lied to CBP about the purpose of her trip with Alen Zheng to China. She withheld her activity as a day trader from Pretrial Services. She repeatedly vacillated on who bought the properties she owns. The income information she (and her parents) provided to the Florida Department of Revenue is inconsistent with the amount of cash used to buy those properties. While the defendant correctly notes that "the release and detention statute does not require a truthful confession for conditions of release to be set," Doc. 37 at 8, it certainly contemplates candor and that deception reflects negatively on one's "history and characteristics." 18 U.S.C. § 3142(g)(3). Indeed, how else can the Court have confidence the defendant will appear as required?

The defendant has substantial foreign ties[6] and has access to funds to finance her flight from the jurisdiction. She argues that her return to Middle District of

---

[6] The Pretrial Services Report reveals that the defendant has lived as an adult in England and multiple states other than Florida, and that despite her relatively young age of twenty-

Florida from China shows that she is not a flight risk. But there is no evidence to suggest that the defendant was aware that *she* was under investigation when she returned. By helping her brother flee and tamper with evidence only a few weeks ago, the defendant has demonstrated her intent to do the same now that her freedom is at stake. "Assessment of the flight risk posed by a defendant often implies a calculation of the relative cost of remaining and submitting to trial or, in the alternative, fleeing the jurisdiction." *United States v. Megahed*, 519 F. Supp. 2d 1236, 1242 (M.D. Fla. 2007). Here, there is a substantial risk the defendant will join her immediate family members in China, rather than facing trial for the charges for which the United States has ample credible evidence.

## D. The Defendant's proposed conditions of release would not assure her presence in court

The Defendant proposes that surrendering her passport, travel restrictions, and GPS tracking are conditions of release that will assure her appearance. But these conditions each ignore the reality of this case and would not "reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(c)(1)(B).

GPS monitoring is not a constant process, meaning that monitoring will not necessarily ensure that the defendant would be apprehended quickly upon attempted flight. "Even attentive and persistent monitoring by personnel of Pre-trial Services leaves the possibility of some hours' delay in both notifying law enforcement of a

---

seven, the defendant has traveled extensively overseas, including to countries like Portugal, France, Spain, and Italy.

releasee's departure and beginning an effective search." *United States v. Megahed*, 519 F. Supp. 2d 1236, 1244 (M.D. Fla. 2007); *See also United States v. Townsend*, 897 F.2d 989, 994–95 (9th Cir. 1990) (observing that the wearing of an electronic device does not "offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction"). And even without her U.S. passport, the defendant could still enter China on a Chinese travel document. *See United States v. Bonilla*, 388 F. App'x 78, 80 (2d Cir. 2010) (upholding the district court's finding that although the defendant surrendered his passport and had close family in the state where the court was situated, he still posed a flight risk because he had significant ties to the Dominican Republic). She could also travel intrastate in an attempt to avoid prosecution, including to New York and Pennsylvania where she studied.

There is no condition or combination of conditions that sufficiently mitigate the risk of flight posed by the defendant. THEREFORE, the United States requests that this Court detain the defendant pretrial.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By:   */s/ Lauren Stoia*
      Lauren Stoia
      Assistant United States Attorney
      United States Attorney No. 201
      400 N. Tampa St., Ste. 3200
      Tampa, FL 33602-4798
      Telephone: (813) 274-6000
      Facsimile: (813) 274-6358
      E-mail: Lauren.Stoia@usdoj.gov

15

**U.S. v. Ann Mary Zheng**                    **Case No. 8:26-cr-101-KKM-SPF**

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Defense Counsel of Record.


/s/ Lauren Stoia
Lauren Stoia
Assistant United States Attorney
United States Attorney No. 201
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Lauren.Stoia@usdoj.gov

16