**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

v.                                                    Case No. 8.26-cr-101-KKM-CPT

ANN MARY ZHENG,

      Defendant.

_____

## ORDER

A grand jury returned a two-count indictment charging Ann Mary Zheng with being an accessory after the fact and evidence tampering. Indictment (Doc. 1). After Zheng's arrest, and following an evidentiary hearing, the magistrate judge ordered that she be detained before trial. *See* Detention Order (Doc. 35). Zheng moves to revoke the magistrate judge's order of detention, Mot. (Doc. 37), and the government responds in opposition, Resp. (Doc. 39). After conducting a hearing to consider limited additional evidence and hear argument from counsel, I conclude that no conditions or combination of conditions would reasonably assure Zheng's appearance as required. Thus, I adopt the magistrate judge's order with modifications and deny Zheng's motion to revoke the order of detention.

## I.    BACKGROUND

The defendant's younger brother, Alen Zheng, allegedly planted an improvised explosive device (IED) at MacDill Air Force Base on March 10, 2026. *See* Indictment; Resp. at 1. In the following days, Ann Mary Zheng secured plane tickets and travel documents for herself and Alen to flee to the People's Republic of China to evade detection and destroyed evidence of Alen's crime, including by selling the vehicle he drove to MacDill to plant the IED. *See id.* at 1, 3–5, 8. The defendant returned to the United States on March 17, 2026, leaving her younger brother in China to reside at a home her family owns there. *See* Detention Order at 11 n.11; *see also* (Doc. 24) at 7; Resp. at 4.

On March 25, 2026, Zheng was charged as an accessory after the fact, in violation of 18 U.S.C. § 3, and with evidence tampering, in violation of 18 U.S.C. § 1512(c)(1). *See* Indictment. Zheng was arrested by the FBI that same day, and on March 26, 2026, Zheng appeared before the magistrate judge for her initial appearance and arraignment. *See* (Doc. 9). The government moved for Zheng to be detained, arguing that Zheng posed a serious risk of flight and that no condition or combination of conditions would reasonably assure her appearance. *See* (Docs. 8, 9); Resp. at 2–3. The magistrate judge continued the detention hearing at Zheng's request to obtain more details on her financial holdings, and in the interim Zheng moved for reasonable conditions of pretrial release. (Doc. 17). The government filed a written opposition. (Doc. 24).

2

Following an evidentiary hearing held on March 31, 2026, the magistrate judge ordered that Zheng be detained pretrial, concluding "that the government has met its burden of showing by a preponderance of the evidence that there is at least a serious risk the Defendant will not appear as directed." Detention Order at 13. According to the magistrate judge, Zheng "has strong ties to China, which has no extradition treaty with the United States; has a strong incentive to flee to that foreign nation or elsewhere due to the strength of the evidence against her and the fact that most of her family—including her parents, grandparents, and one of her brothers—no longer reside in the United States and are either currently living in China or will soon be living there; and has both the financial wherewithal and the resourcefulness to flee, as evidenced by the assistance she provided her brother only a month ago in facilitating his hasty departure to China." *Id.* Based on those findings, the magistrate judge reasoned that no set of conditions—including the surrender of Zheng's passport and travel documents, home detention, or electronic monitoring—would reasonably assure her appearance. *See id.* at 13–14.

On April 20, 2026, Zheng moved to revoke the order of detention. *See* Mot. Zheng does not specifically challenge the magistrate judge's factual findings or the authenticity of the government's proffered evidence, but instead contests certain inferences drawn from those facts, as well as the ultimate conclusions of law. The government responded in opposition, Resp. (Doc. 39),

and filed multiple exhibits in support of its position, *see* (Docs. 42-1–15). Although the government's exhibits were not filed before the magistrate judge, the relevant evidence was proffered at the hearing, discussed (and often quoted directly) in the parties' motions, and addressed at length in the detention order.

On April 21, 2026, I held a hearing on Zheng's revocation motion and inquired as to whether the parties wished to present additional evidence. Although Zheng did not present new evidence, in response to my questions, defense counsel represented that both sets of Zheng's grandparents reside in China, that Zheng has traveled to China multiple times as an adult, and that she is fluent in spoken Mandarin.

The government submitted four additional exhibits that were not before the magistrate judge at Zheng's initial detention hearing, although some of the underlying facts were proffered at the time. *See* (Doc. 45). First, the government offered a cell phone extraction of Zheng's mother's cell phone, which was recovered from the family's home. *See* Ex. Q (Doc. 45). On March 11, 2026, the day after Alen allegedly planted the IED, Zheng's mother googled "what happens to license plates when you sell a car," "closing wells fargo platinum savings account," and "fee for closing CD early." *Id.* Second, the government submitted an image from Zheng's phone showing Alen in the background and an alcoholic beverage in the foreground. *See* Ex. R (Doc. 45-1).

4

According to the government, the image was taken on March 11 while Zheng and her brother were at the airport and is relevant to Zheng's state of mind during her efforts to help Alen flee the country. The third exhibit is a photograph of documents recovered during a search of the Zheng family's home. Ex. S (Doc. 45-2). The government notes a Bank of China bank stub visible in the photograph, a fact that had been proffered in the initial hearing. Finally, the government submits the FBI's notes from its March 18, 2026 interview with Zheng at the Tampa airport. *See* Ex. T (Doc. 45-3). Although Zheng was not initially forthcoming with FBI agents during the interview, she eventually confessed that Alen told her he planted an IED at MacDill *before* Zheng traveled with him to China.

Additionally, the government proffered evidence related to Zheng's ability to obstruct justice if released from detention. On this score, the government represented that the Internal Revenue Service has begun investigating potential discrepancies between the Zheng family's reported income and their expenditures on real property, of which three properties are deeded in Ann Mary Zheng's name. And Zheng continues to communicate with her mother—who is in an immigration detention facility awaiting removal to China—through an unidentified third party. Relatedly, in post-incarceration communications, Zheng has allegedly expressed concern about the location of a MacBook laptop. The government did not recover the laptop during the

search of her home, the contents of which are not fully known. Finally, ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ The government

suggests that if Zheng is not detained, she could access and potentially delete

electronic records.

## II.    LEGAL STANDARD

### A. Section 3145(b)

Under 18 U.S.C. § 3145(b), "[i]f a person is ordered detained by a

magistrate judge . . . the person may file, with the court having original

jurisdiction over the offense, a motion for revocation or amendment of the

order. The motion shall be determined promptly." Once a motion is filed, "the

district court must conduct an independent review to determine whether the

magistrate properly found that pretrial detention is necessary." *United States*

*v. King*, 849 F.2d 485, 490 (11th Cir. 1988). This "independent review" is de

novo. *See United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987).

On review, "the district court has two options." *King*, 849 F.2d at 490.

"First, based solely on a careful review of the pleadings and the evidence

developed at the magistrate's detention hearing, the district court may

determine that the magistrate's factual findings are supported and that the

magistrate's legal conclusions are correct." *Id*. "The court may then explicitly

6

adopt the magistrate's pretrial detention order," which "obviates the need for the district court to prepare its own written findings of fact and statement of reasons supporting pretrial detention." *Id.* The court may also adopt the recommendation while "find[ing] that some of the magistrate's legal conclusions are incorrect or that certain of the magistrate's factual findings are not clearly supported." *Id.* at 491. If so, the district court must "prepare a written order in which it specifies those portions of the magistrate's pretrial detention order which it finds either incorrect or unsupported by the evidence of record." *Id.*

Second, "[i]f the district court, after reviewing the detainee's motion, determines that additional evidence is necessary or that factual issues remain unresolved, the court may conduct an evidentiary hearing for these purposes." *Id.* at 490. In that case, "the district court must enter written factual findings and written reasons supporting its decision." *Id.* But "if the district court concludes that the additional evidence does not affect the validity of the magistrate's findings and conclusions, the court may state the reasons therefor and then explicitly adopt the magistrate's pretrial detention order." *Id.* at 491.

### B. Detention Factors

Pretrial detention of a criminal defendant is warranted when "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the

community." 18 U.S.C. § 3142(e). The government must prove that the defendant poses a risk of flight by a preponderance of the evidence. *See United States v. Quartermaine*, 913 F.2d 910, 915–17 (11th Cir. 1990).

To determine whether a defendant poses a risk of flight, the court must consider the (1) the nature and circumstances of the offenses; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics, including her "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drugs or alcohol abuse, criminal history, and record concerning appearance at court proceedings;" and (4) the nature and seriousness of the danger that would be posed to any person or to the community if the defendant were released pending trial. *See* 18 U.S.C. § 3142(g)(1)–(4).

## III.   ANALYSIS

Based upon my independent review of the record and pleadings before the magistrate, the newly provided evidence, and the arguments of counsel, I conclude that the magistrate judge's factual findings are supported by the record. I therefore adopt those factual findings. I also conclude that the magistrate judge's ultimate legal conclusion is correct, as is his analysis of factors one, two, and three, all of which he concluded favor detention. I therefore adopt that part of the detention order, which alone would suffice to

8

deny Zheng's motion and order her detained consistent with the magistrate judge's ruling.

I write to address the fourth factor. *See* 18 U.S.C. § 3142(g)(4) ("the nature and seriousness of the danger to any person or the community that would be posed by the person's release"). At the initial detention hearing and in its initial briefing, the government did not press the fourth factor. The magistrate judge therefore concluded that danger to the community "does not favor detention" because, "[a]s the government concedes, there is no evidence at this juncture that [Zheng] participated in the attempted bombing or even knew about it in advance." Detention Order at 12. Although that factual finding remains undisturbed, both old and new evidence demonstrates that Zheng poses a danger to the community if released, and that no conditions will alleviate the specific danger she poses.[1]

Zheng's relevant danger to the community is not limited to her risk of physical violence but also includes the danger that she might engage in other criminal activity detrimental to the community. *See King*, 849 F.2d at 487 n.2 ("The term 'dangerousness,' as used in the Bail Reform Act of 1984, has a much broader construction than might be commonly understood in everyday

---

[1] The magistrate judge correctly recognized that "dangerousness as a grounds for detention is not excluded in cases involving detention hearings" premised on a risk of flight. Detention Order at 4 (quoting *United States v. Holmes*, 438 F. Supp. 2d 1340, 1351 (S.D. Fla. 2015)).

9

parlance."); *see also United States v. Ingram*, 415 F. Supp. 3d 1072, 1077 (N.D. Fla. 2019) (collecting cases for this proposition). Other district courts assessing flight risk, for example, have considered evidence that a defendant would continue to obstruct justice or tamper with evidence relevant to the defendant's danger to the community under Section 3142(g)(4). *See United States v. Miller*, No. 18-80241-CR, 2018 WL 6977619, at *8 (S.D. Fla. Dec. 13, 2018) (noting that the "risk of witness tampering or obstruction may be relevant to non-appearance or ongoing danger"); *United States v. Burstyn*, No. 04-CR-60279-ALL, 2005 WL 2297605, at *6 (S.D. Fla. Mar. 18, 2005) (considering that the defendant "mov[ed] property into his name to enrich himself and to assist an alleged drug dealer from forfeiting a home purchased with drug money" as evidence of his danger to the community).

Zheng resists this consideration, arguing that "the release and detention statute does not require a truthful confession for conditions of release to be set." Mot. at 8. Perhaps. But Zheng's candor (or lack thereof) bears on multiple Section 3142(g) factors, and thus I must consider it. Here, I am particularly concerned that, if Zheng is released, she will continue to impede law enforcement investigations involving both herself and her family members. And none of the conditions or combinations of conditions proposed by defense counsel ameliorate this concern.

10

As evidence of her danger, I observe that Zheng has exhibited a troubling pattern of obfuscation and dishonesty from the start of the government's investigation. For example, when Zheng returned from China to the Detroit airport on March 17, she was questioned by Customs and Border Protection (CBP) agents about her "last-minute decision" to purchase tickets and travel to China with her brother. *See* Detention Order at 8; Ex. C (Doc. 42-2) at 5. Zheng told CBP agents that she traveled to China to meet with a family fortune teller, and that Alen planned to receive dental work in China. Although those reasons might have been partially true, Zheng did not disclose that Alen confessed to her that he planted an IED at MacDill days before. The next day, Zheng flew to the Tampa airport, where she was questioned by FBI agents. Again, she initially lied to the agents about her knowledge of Alen's involvement, stating that she knew nothing about Alen allegedly planting an IED at MacDill. *See* Ex. T. At some later point in the interview, Zheng purportedly recanted her initial statements and said that Alen told her about the IED. *See id.* Zheng also admitted that she sold the vehicle that Alen drove to MacDill, a fact she previously withheld. *Id.*

Likewise, Zheng has not been forthcoming about her finances or her family's financial resources, including the properties held in her name. For example, Zheng told CBP agents that she was unemployed but earned income day trading stocks, Ex. C., yet she did not disclose that source of income to

11

Pretrial Services, (Doc. 23). Instead, she told Pretrial Services that she worked part time as a cashier at her parent's restaurant in Tampa and derived income from three rental properties. *See* (Doc. 23). Zheng argues that her divergent statements are "a timing misunderstanding," as "she shifted her focus to helping at the restaurant" after her parents were detained. Mot. at 8. I am unpersuaded. Zheng met with Pretrial Services less than ten days after her CBP interview, and it seems highly unlikely that Zheng ceased all day trading activities (or disposed of all stock assets) in that period. If anything, Zheng's errant statements suggest that Zheng is willing to tell different authorities what she believes is most advantageous to her personal interests at the time.

More concerningly still, Zheng's inconsistent statements have continued through her detention proceedings. At Zheng's initial detention hearing, and even after a continuance to discuss the situation with counsel, Zheng falsely represented (twice) to the magistrate judge that she purchased three rental properties partially using her own money. *See* Detention Order at 9. As it turns out, Zheng's parents purchased the properties with their own money and transferred them into Zheng's name. *See id.*

Zheng's parents' resources raise significant questions and concerns as well and bear on Zheng's opportunity to obstruct or otherwise impede lawful investigations, particularly given her involvement with the family restaurant. Since 2021, neither of Zheng's parents reported earning more than $15,000 in

a quarter. *See* Ex. P. (Doc. 42-15). Despite that, between 2019 and 2021, Zheng's parents purchased her three rental properties ranging in value from $83,000 to $365,000. *See* Resp. at 11–12 (citing Exs. K, L, and M (Docs. 42-10, 42-11, and 42-12)). The Zhengs paid approximately $128,000 in cash at closing for the third property, purchased in June 2021. *See id.* at 12. As the government argues, given the disparity between Zheng's parents' income and their cash outlays on various properties, "it is possible [Zheng's] family has financial resources of which the United States is unaware." Resp. at 13. That view is further supported by the evidence of a Bank of China stub found in the parents' home, Ex. S, Zheng's mother's internet searches related to closing bank accounts and CDs, Ex. R., the IRS's participation in the investigation, and the government's representation that Zheng has repeatedly expressed concern on jail calls regarding a MacBook laptop that might contain information about the family's business or assets. Or it might include additional communications between Zheng and family members. The government did not know why Zheng seemed so concerned about the laptop's contents. But in the light of Zheng's ongoing communications with her mother and ███████████████████████████████████████████████, these facts counsel in favor of detention given Zheng's repeated proclivity to deceive law enforcement and the court if it would seemingly assist her family members.

13

In the light of the above—and the weight of the evidence that Zheng assisted Alen to flee to China and tampered with evidence relevant to Alen's prosecution—I conclude that Zheng's release poses a risk that she will commit further crimes detrimental to the community. Specifically, Zheng's fixation on the location of a MacBook laptop that has not been recovered by law enforcement suggests that the laptop might contain information relevant to the government's investigations into the family's finances or efforts to remove Zheng's parents to China. The proposed conditions of release—electronic monitoring, home confinement, and the surrender of travel documents—do not assuage the risk. ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████ None of the monitoring conditions would prevent Zheng from accessing and tampering with electronically stored information █ ████████████████████████████████ And Zheng's past conduct provides a basis to conclude it is likely that she will do so if released, especially if she perceives that it will help her family members evade law enforcement scrutiny. Obstructing any of the above efforts undoubtedly poses a detriment to the community.

Although I deviate from the magistrate judge insofar as I conclude that the fourth factor, danger to the community, favors detention, I adopt the balance of his order. As the magistrate judge detailed, the nature and

14

circumstances of the offenses charged, the weight of the evidence, and Zheng's history and characteristics—including her financial resources and close familial ties to China—favor pretrial detention. *See* Detention Order at 13–14. I note too that the hearing before me only reinforced that these factors favor detention, as I learned that Zheng is fluent in spoken Mandarin (although she represented she was less adept in written Mandarin), has visited China on several occasions as an adult including as a celebratory trip upon graduation from high school, and that both sets of her grandparents already reside in China. Her connections to China run deep, and she has the ability to adjust seamlessly if she were to successfully flee to China, a country without extradition to the United States. Likewise, although the proposed conditions of release might make it more difficult for Zheng to flee, none of them "reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(c)(1)(B).

## IV.    CONCLUSION

Based on my de novo review of the evidence considered by the magistrate judge, as well as the newly presented evidence, I agree that there is no condition or combination of conditions that sufficiently mitigate Zheng's risk of flight. Accordingly, the following is **ORDERED:**

1. Defendant Ann Mary Zheng's Motion to Revoke the Detention Order (Doc. 37) is **DENIED.**

15

2. The Defendant shall remain in the custody of the Attorney General as ordered (Doc. 35) for confinement without bond pending a final disposition in this case.

**ORDERED** in Tampa, Florida, on April 23, 2026.

Kathryn Kimball Mizelle
United States District Judge

16